IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JACKIE L. SCHERER-HUSTON,

          Plaintiff,                    No. 01:14-cv-00688-HZ

      v.

COMMISSIONER OF SOCIAL             OPINION & ORDER
SECURITY,

          Defendant.

Tim Wilborn
WILBORN LAW OFFICE, P.C.
P.O. Box 370578
Las Vegas, Nevada 89137

      Attorney for Plaintiff

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
Ronald K. Silver
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97201-2902

1 - OPINION & ORDER

Kathy Reif
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Jackie Scherer-Huston brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)).  I reverse the Commissioner's decision and remand for the payment of benefits.

PROCEDURAL BACKGROUND

     Plaintiff applied for DIB and SSI on November 1, 1995, alleging an onset date of December 7, 1993.  Tr. 314-16 (DIB); Tr. 535, 536-37 (SSI).  Her application was denied initially and on reconsideration.  Tr. 314-16 (DIB; Page 315 missing from Administrative Record), 293-94, 298-301; Tr. 538, 539-42 (SSI).  On June 18, 1997, Plaintiff appeared, with counsel, for a hearing before Administrative Law Judge (ALJ) William L. Stewart who issued a decision on November 25, 1997 finding Plaintiff not disabled.  Tr. 543-66.  On December 9, 1998, the Appeals Council remanded the case back to the ALJ for further proceedings.  Tr. 591-94.

     Plaintiff had another hearing with ALJ Stewart who again found her not disabled in a September 21, 1999 decision.  Tr. 615-49.  On April 1, 2002, the Appeals Council remanded the

2 - OPINION & ORDER

case to a different ALJ for further proceedings.  Tr. 659-61.  On December 17, 2004, Plaintiff

appeared with counsel for a new hearing, after which ALJ Jean Kingery found her not disabled in

an April 26, 2005 decision.  Tr. 20-40.  On August 23, 2007, the Appeals Council denied review.

Tr. 13-15.  Plaintiff filed a civil action in this Court and on March 30, 2009, Judge Haggerty

issued an Opinion and Order remanding the case to the agency for further proceedings.  Tr. 984-

93.

On remand, ALJ John Madden conducted a hearing on March 16, 2010 and issued a

decision on April 16, 2010, finding Plaintiff not disabled.  Tr. 997-1017.  Once again, on April

27, 2011, the Appeals Council remanded the matter to the ALJ for a new hearing.  Tr. 1018-21.

On December 30, 2011, after a second hearing before him, ALJ Madden issued a new decision

finding Plaintiff not disabled.  Tr. 963-984A.  On February 24, 2014, the Appeals Council denied

review, Tr. 942-46, making ALJ Madden's December 30, 2011 decision the final agency order

which Plaintiff now appeals to this Court.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on the effects of a brain stem stroke, dizziness, impaired

vision, balance problems, hypertension, somatoform disorder, depression, anxiety, obesity,

migraine headaches, mild left hemiparesis, and left knee surgery.  Tr. 106-11, 138- 41, 335.  As

explained by the ALJ in the December 2011 decision, Plaintiff's insured status for DIB expired

December 31, 1998, and her eligibility for SSI benefits expired on December 31, 2011.  Tr. 967.

Therefore, Plaintiff must establish that her disability began before December 31, 1998 for DIB

and before December 31, 2001 for SSI.

At the time of her alleged onset date of December 7, 1993, Plaintiff was thirty-eight years

old.  Tr. 983.  Plaintiff was forty-six years old on the last date for which she was eligible for SSI.

Tr. 983.  Plaintiff is a high school graduate and has past relevant work experience as a truck

driver.  Tr. 983, 1544.  Because the parties are familiar with the medical and other evidence of

record, I refer to any additional relevant facts necessary to my decision in the discussion section

below.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§

423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v.

Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step

procedure to determine disability).   The claimant bears the ultimate burden of proving disability.

Id.

In the first step, the Commissioner determines whether a claimant is engaged in

"substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S.

137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

determines whether the claimant has a "medically severe impairment or combination of

impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in

combination, meet or equal "one of a number of listed impairments that the [Commissioner]

acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date through December 31, 2011. Tr. 969. Next, at step two, the ALJ determined that Plaintiff has severe impairments of status-post brain stem stroke, probably secondary to methamphetamine abuse; methamphetamine abuse in questionable remission for relevant period; history of mild left hemiparesis and impaired vision, mostly resolved; status-post left knee surgery; somatoform disorder; history of depression, anxiety, and personality disorder with histrionic and dependent traits; obesity; and history of headaches. Id. At step three, the ALJ found that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 970-71.

At step four, the ALJ concluded that Plaintiff had the residual functional capacity (RFC)

5 - OPINION & ORDER

during the relevant period to lift and carry twenty pounds occasionally and ten pounds frequently, to stand and/or walk for six hours per eight-hour work day, and to sit for six hours per eight-hour work day.  Tr. 971.  Her ability to push and pull was limited to the weights specified; she was able to occasionally balance and occasionally climb ladders, ropes or scaffolds.  Tr. 971-72.  She was also to avoid concentrated exposure to hazards such as moving machinery and heights.  Tr. 972.  Plaintiff had moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, performing within a schedule, being punctual, sustaining an ordinary routine without special supervision, accepting instructions and appropriately responding to supervisors, getting along with co-workers and peers without distracting them, and appropriately responding to changes in a work setting.  Tr. 972.

With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past relevant work.  Tr. 983.  However, at step five, the ALJ determined that during the relevant time period, Plaintiff was able to perform jobs existing in significant numbers in the economy such as microfilm document preparer and photocopy machine operator.  Tr. 984A.  Thus, the ALJ determined that Plaintiff is not disabled.  Id.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation marks omitted).  The court considers the record as a whole, including both the

evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591 (internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff argues that the ALJ (1) improperly rejected the opinion of examining psychologist Rita Sullivan, Ph.D.; (2) improperly rejected the opinion of treating physician Donna Tribelhorn, M.D.; and (3) improperly rejected third-party witness testimony.  As a result, she argues that the ALJ's RFC does not contain all of her limitations and that when her restrictions are properly considered, she is disabled.  Because I agree with Plaintiff that the ALJ improperly rejected Dr. Sullivan's assessed limitations, I do not discuss Plaintiff's other arguments.

Social security law recognizes three types of physicians:  (1) treating, (2) examining, and (3) nonexamining.  Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant.  Id.; 20 C.F.R. §§ 1527(c)(1)-(2), 416.927(c)(1)-(2).

If the treating or examining physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  Even if the treating or

examining physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record.  Id.; Bayliss, 427 F.3d. at 1216.

Dr. Sullivan examined Plaintiff on February 11, 1999.  Tr. 520.  She administered several tests, including the Minnesota Multiphasic Personality Inventory - 2 (MMPI -2), the Wechsler Adult Intelligence Scales (WAIS), the Wide Range Achievement Test (WRAT), the Depression Adjective Check List (DACL), the Zung Self Rating Depression Scale, the Beck Depression Index, and the Beck Anxiety Index.  Id.  She also conducted an in-person structured clinical interview and a mental status exam.  Id.  She reviewed prior records.  Id.  Dr. Sullivan wrote a ten-page narrative report and completed a two-page checkbox Mental Residual Function Capacity (RFC) Report.  Tr. 520-29, 530-31.

In her narrative report, Dr. Sullivan remarked on Plaintiff's "fairly negative attitude" and her tendency to answer questions briefly to provide "very little detail overall."  Tr. 521.  She noted instances where the record did not support Plaintiff's statements or where Plaintiff appeared to contradict herself.  E.g., Tr. 521 (Plaintiff denied any significant substance use but the record supported at least past use of alcohol and other drugs in remission); Tr. 523 (Plaintiff refused to provide any details of drug or alcohol use other than to say she experimented with most illicit drugs as a teen and that the most she would drink is three to four beers a year; record indicated alcohol abuse stopping in 1979 as well as methamphetamine usage); Tr. 521 (Plaintiff stated that she never had a serious relationship but then stated that she was married once for a short time and had lived with the man for two years before marrying him).

In discussing the mental status exam, Dr. Sullivan noted that after being asked to

complete a "serial 3," Plaintiff gave three answers before stating she would go no further and would not attempt a "serial 7."  Tr. 524.  Dr. Sullivan remarked that Plaintiff was "clearly unhappy with having to complete the process."  Id.  She noted that "[g]iven [Plaintiff's] apparent lack of motivation, her performance on the [mental status exam] tasks presented below [is] likely not reflective of her optimum capacity."  Id.  Dr. Sullivan then administered several mental status exam tests such as having Plaintiff repeat digits going forward and backward, recall unrelated nouns, and answer questions designed to assess her judgment.  Tr. 525.  In summarizing these tests, Dr. Sullivan wrote that Plaintiff had no "deficits in remote or intermediate memory in that she could describe[] significant life events and those events leading up to her current situation with adequate detail."  Id.  But, she added, "[Plaintiff] could not recall information immediately after hearing it, which [is] more likely related to lack of effort."  Id.

        In introducing the section on test results, Dr. Sullivan wrote that Plaintiff "appeared indifferent at times and 'put out' at others.  She clearly did not want to be bothered with the testing."  Id.  Plaintiff refused to complete the picture arrangement portion of testing on the first day, stating that the "'last time it freaked me out.'"  Id.  She returned a second day to complete testing and was willing to complete the task after being told that she could stop if it became too stressful.  Id.  Dr. Sullivan noted that Plaintiff's attention span and concentration "appeared adequate to complete the process."  Id.  Her persistence and motivation were "marginally adequate for the tasks."  Tr. 525-26.  She stated that "[l]ikely these scores do not fairly indicate her capacity due to her lack of willingness to try."  Tr. 526.  Dr. Sullivan then proceeded to discuss the test results of the individual tests.  Tr. 526-28.

        She noted that Plaintiff's MMPI-2 clinical profile was "probably valid" and explained that

9 - OPINION & ORDER

individuals with this profile "tend to exhibit a pattern of chronic psychological maladjustment and frequently have histories of acting out behavior, including outbursts of anger." Tr. 526. Plaintiff had "a great many vague physical complaints, especially symptoms of tension, insomnia, and stomach distress." Id. Additionally, Dr. Sullivan noted that Plaintiff was "[a]pparently emotionally immature," as well as "dependent and demanding," and a person who tended "to become irritable when her demands are frustrated." Id. She added that Plaintiff "may appear suspicious and hostile toward professional staff." Id. Additionally, Dr. Sullivan stated that Plaintiff "has difficulty managing routine affairs, and the items she endorsed suggest a poor memory, concentration problems, and an inability to make decisions." Id. Dr. Sullivan reported that Plaintiff "shows a tendency to reject authority and may have conflicts over rules. She reports some antisocial beliefs and attitudes, admits to rule violations, and acknowledges antisocial behavior in the past." Id. Dr. Sullivan also noted that Plaintiff appeared to have great difficulty with relationships in the past and that individuals with her profile often have a "long standing personality disorder, with substance use or abuse as a prominent feature of their clinical pattern." Id. They may show elements of an anxiety or depressive disorder. Id. Dr. Sullivan opined that Plaintiff's "response content is consistent with the antisocial features in her history." Id.

On the Trial Making Test, Plaintiff's scores were in the "moderately/severely impaired range" and indicated a possibility that she suffered from "some organicity." Id. She scored within the moderate to marked depressed range on the Zung Self Rating Depression test and in the moderately depressed range on the Beck Depression Inventory test. Id. Her scores on the DACL indicated that she reported experiencing feelings consistent with significant depression. Tr. 527. She fell within the severely anxious range on the Beck Anxiety Inventory test. Id. Her

IQ testing produced scores ranging from the "well below average range" to the "below average range."  Tr. 527-28.

Dr. Sullivan assessed Plaintiff as having (1) an undifferentiated somatoform disorder; (2) an anxiety disorder NOS; (3) amphetamine abuse (in full sustained remission by client report); and (4) a personality disorder NOS.  She rated her Global Assessment of Functioning (GAF) at a 65.  Tr. 528.  In her conclusions and recommendations, Dr. Sullivan explained that while Plaintiff "appear[s] to have some organicity secondary to her stroke, . . . it is clear in talking with her and reviewing the record that she exaggerates her symptomatology."  Id.  Dr. Sullivan noted that Plaintiff's anxiety about having another stroke was understandable and further noted that Plaintiff apparently suffered from significant anxiety before her stroke.  Id.

Dr. Sullivan believed that Plaintiff's "continued use of narcotic pain relievers set up a secondary gain loop."  Tr. 529.  She suggested, following an earlier recommendation of a different practitioner, that Plaintiff undertake behavioral interventions as an alternative to pharmacologic management for her chronic pain and this "would eliminate at least some of the secondary gain."  Id.

Although Dr. Sullivan recommended that Plaintiff's "functional overlay" be addressed therapeutically, she noted that Plaintiff was a poor candidate for therapy because Plaintiff will likely not see value in it as "she does not appear interested in discussing her problems and seems to have little motivation to change."  Id.  Dr. Sullivan rejected the IQ test results of the WAIS as not accurately representing Plaintiff's true ability and refused to diagnose her with borderline intellect.  Id.  Instead, based on her interaction with Plaintiff, Dr. Sullivan found her to be "of about average intelligence."  Id.  In the final paragraph of her report, Dr. Sullivan stated:

> The psychogenic impacts discussed above do create a significant barrier to
> employment, as she will likely undermine her own efforts.  It is clear she likes the
> attention these problems get her.  A frank discussion with her physician to give
> her a realistic view of her physical limitations may be helpful, but likely she will
> discredit anyone who tells her this and look for a more sympathetic ear.

Id.

In the two-page Mental RFC Report, Dr. Sullivan assessed Plaintiff as not significantly

limited in several abilities and moderately limited in several others.  Tr. 530-31.  Her moderate

limitations were in the abilities to (1) understand and remember detailed instructions; (2) carry

out detailed instructions; (3) maintain attention and concentration for extended periods; (4)

perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances; (5) sustain an ordinary routine without special supervision; (6) complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods; (7)

accept instructions and respond appropriately to criticism from supervisors; (8) get along with

co-workers or peers without distracting them or exhibiting behavioral extremes; and (9) respond

appropriately to changes in the work setting.  Id.  Importantly, the Mental RFC Report completed

by Dr. Sullivan defines "moderately limited" as "[a]n impairment which seriously limits but does

not preclude the individual's ability to function within the designated activities."  Tr. 530.

Although ALJ Madden's April 2010 decision contained some discussion of Dr. Sullivan's

report, Tr. 1008-09, the Appeals Council remanded the case back to him because it determined

that his April 2010 hearing decision did not contain an adequate evaluation of that report.  Tr.

1021.  The Appeals Council explained that while the April 2010 decision addressed Dr.

Sullivan's written assessment, it did not specifically address the Mental RFC form attached to the

assessment.  Id.  Thus, the Appeals Council instructed the ALJ, upon remand, to further consider Dr. Sullivan's opinion, to explain the weight given to her opinion, and to "specifically address the mental residual capacity form."  Id.  The Appeals Council also suggested that it might be appropriate for the ALJ to contact Dr. Sullivan to provide additional evidence or clarification of her opinion.  Id.

During the November 30, 2011 hearing after the Appeals Council remand, ALJ Madden stated that he believed he had asked the vocational expert (VE) in 2010 whether a person faced with limitations as opined by Dr. Sullivan could perform work.  Tr. 1542.  Plaintiff's attorney agreed that the ALJ had commented on Dr. Sullivan's opinion in the body of his decision and that his 2010 RFC "pretty much covered" most of what Dr. Sullivan addressed in the form attached to her report.  Tr. 1543.  But, Plaintiff's attorney believed there were some missing limitations in the 2010 RFC and indicated his desire to question the VE at the November 2011 hearing about those. Id.

Plaintiff's attorney posed several hypotheticals to the VE at the November 2011 hearing. The attorney asked the VE to review Dr. Sullivan's Mental RFC Report, which the VE did.  Tr. 1548.  The attorney confirmed that an individual with physical limitations consistent with the ALJ's RFC, but with other limitations assessed by Dr. Sullivan in the Mental RFC Report, would not be able to perform Plaintiff's past relevant work.  Id.  Next, the attorney asked if such a person would be able to perform unskilled, sedentary work on a sustained basis.  Tr. 1549.  To this, the VE responded that interpreting "moderately limited" as "per [the second page of the two-page Mental RFC Report]," "it would appear to limit the claimant to work at an SVP of 2 or less."  Id.  With that, the VE stated that the individual could work.  Id.  But then, the VE stated

the "word[s] moderately limited [are] open to interpretation." Id.

Plaintiff's attorney then drew the VE's attention to the definition of "moderately limited" in the form Dr. Sullivan used, which was on the first page of the two-page Mental RFC Report. Id. The attorney explained that it meant "'an impairment that seriously limits, but does not preclude, the individual's ability to function within the designated activity.'" Id. (quoting Mental RFC Report). The VE responded that by using "the definition of seriously limits, particularly with reference to complete a normal workday or work week, and sustain an ordinary routine, and perform activities within a schedule, and with reference to attention and concentration for an extended period, . . . the worker is unemployable" when those activities are seriously limited. Tr. 1549-50.

In his written decision, the ALJ first discussed Dr. Sullivan's report at step three when determining that Plaintiff's impairments, considered singly or in combination, did not meet or equal a listed impairment. Tr. 970-71. There, the ALJ noted Dr. Sullivan's comments that Plaintiff appeared to be "dependent, demanding, and manipulative in interpersonal relationships" and that she "displayed a tendency to seek out a sympathetic ear[.]" Tr. 971. He found her limitations in social functioning to be moderate during the relevant period. Id. (further noting that she demonstrated good relationships with her friends and family but that her impairments and somatic focus could interfere with her ability to respond appropriately to supervisors, the public and co-workers). Id. The ALJ suggested that because of Plaintiff's "focus on somatic complaints and her own conclusion that she is disabled, limitation from understanding, remembering, and carrying out detailed or complex instructions was appropriate during the relevant period." Id.

14 - OPINION & ORDER

Then, in discussing the reasons for his RFC, the ALJ reviewed the narrative portion of

Dr. Sullivan's report, noting that Plaintiff refused to complete testing and refused to cooperate.

Tr. 976.  The ALJ next discussed the Mental RFC Report.  Tr. 976.  Given the importance of Dr.

Sullivan's report as noted by Judge Haggerty and the Appeals Council, I quote the ALJ's

discussion on this issue in its entirety:

> Dr. Sullivan also attached a form utilized by the State in evaluating the claimant's
> mental residual functional capacity. . . .  The undersigned notes that this form does
> not reflect the definitions of impairment levels used by the Social Security
> Administration.  The State form uses the definition of "moderate" to mean
> "seriously limits, but does not preclude the individual's ability to function within
> the designated activities."  In contrast, the Social Security Administration defines
> "moderate" as "more than a slight limitation in this area but the individual is still
> able to function satisfactorily."  Although Dr. Sullivan identified several
> inconsistencies in the claimant's presentation, because Dr. Sullivan had the benefit
> of reviewing only a minimal amount of the claimant's records, she remained
> largely reliant on the claimant's reports for information.  To the degree Dr.
> Sullivan's opinion relies on the claimant's subjective reports, which are not
> credible, it is given less weight.  For example, the undersigned notes that the
> claimant misrepresented to Dr. Sullivan the extent of her previous and ongoing
> drug use.  Therefore, generally following Dr. Sullivan's assessment, but utilizing
> the definition of "moderate" as it appears in the Social Security regulations, the
> undersigned has largely adopted Dr. Sullivan's opinion and paragraph "B"
> limitation ratings in making the residual functional capacity determination, noting
> that this is the most restrictive opinion of record.
>
> Although the claimant's attorney asserted at the November 30, 2011 hearing that
> the residual functional capacity does not include Dr. Sullivan's ratings that the
> claimant had moderate limitations in attendance, completing a normal work day
> and work week, or performing at a consistent pace, the undersigned disagrees, and
> notes that these limitations are generally encompassed within the above
> limitations; however, any indication from Dr. Sullivan's ratings that the claimant
> is likely to be absent from work in excess of what is usually tolerated in the
> competitive work place, is unable to complete a normal work day or work week,
> or is unable to perform activities within a schedule[,] are not supported by the
> record as a whole or Dr. Sullivan's findings and observations. . . . Moreover, the
> undersigned again notes that the form utilized by Dr. Sullivan cited definitions of
> "mild, " "moderate," and "marked" that are inconsistent with the definitions used
> by the Social Security Administration.  The interpretation asserted by the

claimant's attorney is not consistent with Dr. Sullivan's objective findings, narrative summary, or GAF score assignment of 65. Furthermore, the undersigned rejects the definition of "moderate," as used in the State form filled out by Dr. Sullivan. After considering the record as a whole, the undersigned finds that the State form definition and the interpretation of Dr. Sullivan's ratings are excessive and are not supported by the objective evidence. These excessive interpretations are reflected in the hypothetical persons presented by the claimant's attorney to the vocational expert at the November 30, 2011 hearing, which appear below.

Tr. 976-77.

Plaintiff argues that the ALJ erred by using a different definition of "moderate" than Dr. Sullivan used in expressing her opinion as to Plaintiff's limitations and further, that the ALJ cannot redefine "moderate" without contacting Dr. Sullivan to opine on Plaintiff's limitations under a new scale. Plaintiff suggests that the ALJ had predetermined the outcome of his decision before the hearing and was thwarted by the VE's testimony that Dr. Sullivan's limitations would be disabling using the "seriously limits" definition provided in her Mental RFC Report. Thus, she contends the ALJ was forced to "substitute" his own less limiting definition of "moderate" and then disingenuously suggested that he was in fact "adopting" Dr. Sullivan's limitations because his RFC allowed for "moderate" restrictions.

Plaintiff also argues that the ALJ erred by rejecting Dr. Sullivan's opinion as based on Plaintiff's self-reports because the very behaviors the ALJ blames are actually symptoms of Plaintiff's mental disorders. According to Plaintiff, Dr. Sullivan's diagnoses of undifferentiated somatoform disorder and personality disorder with dependent and histrionic features produce symptoms of dramatic, exaggerated, manipulative, and similar behavior with excessive focus on physical pain. Pl.'s Op. Brief at 14-16 (citing Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 4th ed. Text Rev. (2000) (DSM-IV-TR)). She contends that it "is legal

16 - OPINION & ORDER

error for an ALJ to discount the allegations of claimants because they have psychological impairments which cause them <u>involuntarily</u> to experience symptoms at a level greater than is normal." <u>Id.</u> at 16.

Defendant contends that the ALJ's interpretation of Dr. Sullivan's opinion is supported by substantial evidence in the record. Defendant appears to suggest that the definition of "moderately limited" in the Mental RFC Report completed by Dr. Sullivan is ambiguous, because when one focuses on the term "seriously limits," the limitation indicates a disabling level of severity but when one focuses on the phrase "does not preclude the individual's ability to function within the designated activities," the limitation does not equate to a disabling level of severity. It is unclear where Defendant goes with this argument, however, because it was not noted by the ALJ nor did the VE testify to any confusion with the definition.

Next, Defendant points to several remarks by Dr. Sullivan in her narrative report which Defendant contends are inconsistent with a moderate impairment interpreted as "seriously limits." Defendant points to the GAF score of 65 which reflects "mild symptoms" or "some" difficulty in functioning with the person "generally functioning pretty well." Def.'s Brief at 6 (citing DSM-IV-TR at 34). Defendant also notes that Dr. Sullivan found that Plaintiff had no significant deficits with working memory, focused attention, or perseverance, and that her performance on tasks was not reflective of her true ability because she lacked motivation. Defendant also points to Dr. Sullivan's mention of Plaintiff's secondary gain.

Finally, Defendant argues the ALJ properly gave Dr. Sullivan's opinions less weight because she relied on Plaintiff's subjective reports. Defendant asserts that the existence of a somatoform disorder diagnosis does not protect a claimant's subjective reports. Defendant notes

17 - OPINION & ORDER

that the ALJ gave several reasons other than Plaintiff's symptom exaggeration and motivational

issues for finding Plaintiff not credible.

Although I understand the ALJ's interpretation of Dr. Sullivan's opinion a bit differently

than Plaintiff, and although I reject Plaintiff's assertion that the ALJ had determined before the

November 2011 hearing that Plaintiff was disabled, I agree with Plaintiff that in this particular

case, the ALJ erred.  In my opinion, the appropriate way to characterize the ALJ's decision is that

he dismissed Dr. Sullivan's checkbox Mental RFC Report assessments of "moderately limited"

(as defined as "seriously limits" but without precluding the ability to function in the designated

activity), as unsupported by her testing and narrative report.  E.g., Molina v. Astrue, 674 F.3d

1104, 1111-12 (9th Cir. 2012) (ALJ may properly reject "standardized, check-the-box form" if

not supported by reasoning or clinical findings); Bayliss, 427 F.3d at 1216 (discrepancy between

a doctor's chart notes, recorded observations, and opinions, and an assessment of a claimant's

abilities, is a clear and convincing reason to reject the doctor's assessment).  The ALJ then

continued to use the word "moderate" in his assignment of limitations in his RFC, but it is clear

that he meant a limitation less than the "serious limits" moderate limitations that Dr. Sullivan had

assessed.

The question is whether the ALJ erred by concluding that Dr. Sullivan's "seriously limits"

limitations are inconsistent with her narrative report and testing results.  In summarizing her

mental status exam, Dr. Sullivan found that Plaintiff did not have deficits in remote or

intermediate memory, but she did have problems recalling information immediately after hearing

it.  Tr. 525.  Dr. Sullivan thought those problems were "likely related to lack of effort."  Id.  Thus,

at least as to the mental status exam, she noted Plaintiff's short-term memory issues but believed

the problem was motivational.

However, in discussing Plaintiff's valid MMPI-2 profile, Dr. Sullivan endorsed Plaintiff's "difficulty managing routine affairs, . . . poor memory, concentration problems, and an inability to make decisions." Tr. 526. She noted Plaintiff's "tendency to reject authority" and her antisocial behavior. Id. She also found her anxiety about a recurrent stroke to be understandable. Tr. 528. She determined that Plaintiff was of "about average intelligence." Id.

Then, despite Dr. Sullivan's repeated references to Plaintiff's lack of motivation, exaggeration of symptoms, and inconsistencies, Dr. Sullivan nonetheless found that the "psychogenic impacts" of her diagnoses "create a significant barrier to employment[.]" Tr. 529. Furthermore, while Dr. Sullivan opined that therapy would be useful and that a discussion with her physician who could give her a "realistic view" of her physical limitations would be helpful, she recognized that Plaintiff's limitations would interfere with her ability to benefit from either of those suggestions.

While Dr. Sullivan's report indicates that she was fully aware of Plaintiff's exaggerated symptoms, lack of effort, and inconsistencies, she still assessed Plaintiff with several moderate limitations which were defined for her as "seriously limiting" although not entirely precluding the particular activity. A comparison of the findings in her narrative report and the particular functions she found to be seriously limited shows that the narrative report supports her Mental RFC Report. The ALJ's conclusion that the Mental RFC Report's assessments are inconsistent with the narrative report and testing is error.

Although Dr. Sullivan noted that Plaintiff's attention span and concentration "appeared adequate to complete the [testing] process," she also determined that Plaintiff had "difficulty

managing routine affairs," a poor memory, concentration problems, and an inability to make decisions. The basis for these determinations was the valid MMPI-2. Dr. Sullivan then rated Plaintiff as "seriously limited" in the abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, sustain an ordinary routine without supervision, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Her assessment of these limitations is supported by her report and test results.

The MMPI-2 also supported Dr. Sullivan's opinion that Plaintiff would have "chronic psychological maladjustment" including acting out behavior and outbursts of anger and thus, she opined that Plaintiff may appear hostile toward professional staff, have a tendency to reject authority, experience conflicts over rules, and engage in antisocial behavior. Dr. Sullivan also endorsed Plaintiff's anxiety. And, in summarizing her findings, she noted that the "psychogenic impacts" of Plaintiffs diagnoses would "create a significant barrier to employment[.]"

These findings support her "seriously limited" assessment in the abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Sullivan's assessment of these limitations is supported by her narrative report and test results.

It is important to observe that Dr. Sullivan assessed Plaintiff as "seriously limited" in

these abilities despite being fully aware that Plaintiff exaggerated her symptoms, was

unmotivated, and was manipulative, dependent, and inconsistent in her reports.  Dr. Sullivan's

report of Plaintiff's behavior was fairly negative and she recognized that Plaintiff would not

engage in recommended therapies to address her problems.  Nonetheless, as validated by her

narrative report and the MMPI-2 in particular, she recognized that Plaintiff had serious

limitations in several abilities.  As an expert in her field of psychology, Dr. Sullivan is presumed

to have the knowledge to assess the impact of the negative behaviors and still render a

competent, informed opinion as to Plaintiff's limitations.  When her narrative report and the

Mental RFC Report are closely examined and compared, the "seriously limits" assessments in the

Mental RFC Report are supported by the narrative report.[1]

Additionally, the rejection of Dr. Sullivan's report and limitations to the extent it was

based on Plaintiff's self-reports is not an adequate basis for rejecting the "seriously limits"

restrictions in her Mental RFC Report.  First, several of the restrictions were based on the testing

administered by Dr. Sullivan, notably the valid MMPI-2.  Thus, they cannot be discounted as

having been based on Plaintiff's self-report.  Second, as indicated, Dr. Sullivan herself was

skeptical of Plaintiff's reporting, but nonetheless rendered these restrictions at the "seriously

limits" level.  In other words, Dr. Sullivan appeared to doubt Plaintiff's credibility but still opined

that Plaintiff was seriously limited in certain functional abilities.

In sum, construing the ALJ's decision as having rejected Dr. Sullivan's "seriously limited"

---

[1]  It is also important to observe that the ALJ's RFC contains most of the moderate
limitations assessed by Dr. Sullivan showing that he did not outright reject Plaintiff's restrictions
in these functional abilities but instead recognized that she has valid limitations in several
categories.  The degree of the limitations is at issue and Dr. Sullivan's narrative report and testing
are consistent with her "severely limits" assessments.

restrictions as unsupported by her narrative report and her testing, the ALJ erred because in this particular instance the report supports the restrictions and Dr. Sullivan made the restrictions fully cognizant of Plaintiff's exaggerations, manipulations, and inconsistencies.

In social security cases, remands may be for additional proceedings or for an award of benefits.  E.g., Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded[,]" but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test. Id. at 1020; see also Treicher v. Comm'r, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps).  First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.  Garrison, 759 F.3d at 1020.  Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. Id.  Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled.  Id.  To remand for an award of benefits, each part must be satisfied.  Id.; see also Treicher, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

Here, the ALJ failed to provide legally sufficient reasons for rejecting Dr. Sullivan's limitations.  The record is fully developed because the VE testified at the November 2011 hearing that a hypothetical individual with the physical limitations as assessed by the ALJ and the

further limitations as assessed by Dr. Sullivan with a "seriously limited" interpretation, would not be employable.  If the case were remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find Plaintiff disabled.

Furthermore, this case has been pending for close to twenty years.  It must come to an end.  As various cases have noted, the "crediting as true" rule recognizes "'the importance of expediting disability claims.'"  Holohan, 246 F.3d at 1210 (quoting Ghokassian v. Shalala, 41 F.3d 1300, 1304 (9th Cir. 1994)).  "Remanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand."  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (internal quotation marks omitted) (characterizing Commissioner's request for remand as a "heads we win; tails, let's play again system of disability benefits" which was inappropriate when record showed that claimant was unable to perform gainful employment in the national economy even though the VE did not address the precise work limitations at issue); see also Moisa v. Barnhart, 367 F.3d 882, 887 (9th Cir. 2004) (the "Commissioner, having lost this appeal, should not have another opportunity to show that Moisa is not credible any more than Moisa, had he lost, should have an opportunity for remand and further proceedings to establish his credibility.").

/ / /

/ / /

/ / /

/ / /

/ / /

CONCLUSION

The Commissioner's decision is reversed and this case is remanded for a determination of benefits.

IT IS SO ORDERED.

Dated this _____ day of _____, 2015

Marco A. Hernandez
United States District Judge

24 - OPINION & ORDER